# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of: | ) | |
| | ) | |
| Information associated with Facebook account Username: | ) | Case No. *17-M-055* |
| Ymmot Kst, ID address of | ) | |
| https://www.facebook.com/profile.php? | ) | |
| id=100009676800027 | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

■ evidence of a crime;
■ contraband, fruits of crime, or other items illegally possessed;
■ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21 U.S.C. 963, conspiracy to import controlled substances into the United States.

The application is based on these facts: See attached affidavit.

☑ Delayed notice of _90_ days (give exact ending date if more than 30 days: Friday, Sept. 1, 2017) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Kellen J. Williams, DEA
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: June 2, 2017

_____
*Judge's Signature*

City and State: Milwaukee, Wisconsin

Honorable David E. Jones    U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Kellen J. Williams, being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I have been employed as a Special Agent with the Drug Enforcement Administration ("DEA") since September 2012. I am currently assigned to the DEA Milwaukee District Office, High Intensity Drug Trafficking Area, located in Milwaukee, Wisconsin. As a Special Agent, my duties include conducting investigations involving possible criminal violations of Federal laws, particularly those offenses enumerated in Title 18, United States Code, Sections 2516(1)(e), 1956, and 1957, and Title 21, United States Code, Sections 841(a)(1), 843(b), 846, 856, 952, and 963. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of, and make arrests for, offenses enumerated in Title 18 and Title 21 of the United States Code. I have conducted numerous criminal investigations of individuals involved in various narcotics and money laundering offenses, and have received specialized training on drug identification, surveillance operations, firearms handling, report writing techniques, confidential source handling, and Title III wire interceptions.

2.      I make this Affidavit in support of an application for a search warrant for information associated with the following Facebook, Inc. ("Facebook") account:

> a. **Facebook Username:** Ymmot Kst, with a Facebook identification address of https://www.facebook.com/profile.php?id=100009676800027, ("Target Account"). This information is stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California. The information to be searched

is described in the following paragraphs and in Attachment B.

3.      This Affidavit is made in support of applications for a search warrant pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), and Rule 41 of the Federal Rules of Criminal Procedure. The search warrant requested would require Facebook to disclose to the government copies of records and other information in their possession pertaining to the subscriber(s) or customer(s) associated with the account associated with the aforementioned username, including the contents of communications, as further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

4.      Based on the facts as set forth in this Affidavit, there is probable cause to believe that violations of Title 21, United States Code, Section 963 were committed by the user(s) of the Target Account. There is also probable cause to believe that the Target Account, as more fully described in Attachment A, contain fruits, evidence and instrumentalities of these crimes, as described in Attachment B.

5.      The facts in this Affidavit come from your Affiant's personal observations and knowledge, as well as your Affiant's training and experience, and information obtained from other law enforcement officers and witnesses. Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a search warrant, it does not contain all the information currently known by law enforcement in this investigation.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is "a district

2

court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## STATUTORY AUTHORITY

7. Title 21, United States Code, Section 963 makes it unlawful for anyone to knowingly enter into an agreement to accomplish a shared and unlawful plan to knowingly import a controlled substance into the United States from some place outside the United States.

## FACEBOOK

8. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook permits users to establish individual accounts with Facebook, which can then be used to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public on what is commonly referred to as a Facebook "page" or "profile page."

9. Facebook requires users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

10. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.

3

Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

11.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space on the user's page where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

12.     Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's

4

purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

13.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

14.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

15.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

16.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

17.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is

5

visible to the user but cannot be viewed by people who visit the user's Facebook page.

18.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

19.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift.

20.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

21.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

22.     Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group.     Facebook also assigns a group identification number to each group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

23.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's

6

profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

24. Facebook also retains Internet Protocol ("IP") logs for a given username or IP address. These logs may contain information about the actions taken by the user or IP address on Facebook, including information about the type of action, the date and time of the action, and the user and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

25. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

26. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning a

7

subscriber and the use of Facebook, such as account access information, transaction information, and other account information.

## **BACKGROUND OF INVESTIGATION**

27.     In August, 2016, case agents interviewed a confidential source, hereinafter referred to as CS-1[1], regarding the GOMEZ DTO. CS-1 has known Luis GOMEZ for about ten years and knows him as "Paco." CS-1 knows GOMEZ has been involved in selling narcotics for at least ten years.   CS-1 knows GOMEZ sells kilogram quantities of heroin, cocaine, methamphetamine, and marijuana.

28.     On April 7, 2017, the Honorable Judge Lynn Adelman, United States District Judge in the Eastern District of Wisconsin, signed an order authorizing the interception of wire and electronic communications to and from the cellular phone assigned phone number (708) 490-2848 (Target Telephone #13), used by GOMEZ. The calls detailed below were intercepted pursuant to that authorization.

29.     On April 16, 2017, at 11:53 a.m., GOMEZ, utilizing Target Telephone #13, placed an outgoing call to Mexican phone number 52-6531457669[2], which has been identified as a number being used by a Mexico source of supply known to case agents as "Tomas" or "Tommy."   During the conversation, "Tommy" asked, "Did Jarocho [person from Veracruz] come by or not yet?"  GOMEZ replied, "He hasn't come yet, but he is supposed to come by

---

[1]   CS-1 has been providing reliable information to law enforcement since 2012.  Specifically, CS-1 conducted multiple controlled purchases of narcotics from individuals.     CS-1 has conducted consensually-recorded conversations with drug dealers, both in person and on the telephone. CS-1's information has been corroborated by other confidential sources, information obtained from various public databases, physical surveillance, and through controlled drug purchases and consensually-recorded conversations and phone calls.

[2] All intercepted calls and text messages detailed below between ESQUIVEL-SOTELO and GOMEZ, GARNICA-MANRIQUEZ, and GOMEZ, and "Tommy" and GOMEZ, occurred in Spanish.  The calls and text messages were later translated by Spanish-speaking case agents or linguists.

8

later." "Tommy" asked, "But did he get back to you or not?" GOMEZ replied, "Yes. He said he had…. Someone gave him like twenty bucks, but he was waiting for another dude to bring him more money." GOMEZ later stated, "…this car will be leaving on Monday, Lord willing, brother." Case agents believe GOMEZ told "Tommy" he received $20,000 ("twenty") in drug proceeds but is waiting for more before sending the car. Case agents are aware that the GOMEZ DTO utilizes hidden compartments in vehicles to transport narcotics and currency.

30.     On April 17, 2017, case agents observed GOMEZ, Mario ESQUIVEL-SOTELO, and Oscar GARNICA-MANRIQUEZ deliver a gray 2012 Volkswagen Jetta 4-door, with no license plates, to a vehicle transportation carrier in Milwaukee, Wisconsin.

31.     On April 18, 2017, the Illinois State Police conducted a traffic stop of the vehicle transportation carrier in West Chicago, Illinois. During a consensual search of the car carrier, law enforcement located what appeared to be a concealed compartment in the passenger area of the Jetta. Law enforcement removed a large amount of bulk U.S. currency, later determined to be $145,380, from the compartment.

32.     On April 26, 2017, at 10:38 a.m., GOMEZ, using Target Telephone #13, received an incoming call from Mexican phone number 52-6531457669, used by "Tommy." During the conversation, GOMEZ stated, "Yeah, give me the new number so I can call you from the new one." "Tommy" replied, "I'll send it to Mr. Camaron, to his Facebook." GOMEZ asked, "To his Facebook?" "Tommy" replied, "Yes, I'll send it to Mosca's." GOMEZ stated, "Oh, to Mosca. Okay." Case agents believe that due to the seizure of drug proceeds referenced above, GOMEZ and "Tommy" switched their cellular telephone numbers. "Tommy" told GOMEZ he would send his new number to "Mosca's Facebook." Case agents are aware that "Mosca" is a nickname for GARNICA-MANRIQUEZ.

33. On May 12, 2017, the Honorable Judge Lynn Adelman, United States District Judge in the Eastern District of Wisconsin, signed an order authorizing the interception of wire and electronic communications to and from the cellular phone assigned phone number (651) 313-2147 (Target Telephone #14), used by GOMEZ. The calls detailed below were intercepted pursuant to that authorization.

34. On May 12, 2017, at 1:11 p.m., GOMEZ, using Target Telephone #14, placed an outgoing call to (414) 460-1376. Case agents identified the voice of the user of (414) 460-1376 as that of ESQUIVEL-SOTELO. GOMEZ stated, "Did you go for the glass?" ESQUIVEL-SOTELO replied, "I'm still here waiting for it." GOMEZ stated, "Alright, I'm heading over there." ESQUIVEL-SOTELO stated, "Hey, what was I going to tell you, the transport people called me, dude." ESQUIVEL-SOTELO goes on to say, "Well I told him it was a Marquis." GOMEZ later asked, "And what time did he tell you? Did you say that around five?" ESQUIVEL-SOTELO replied, "Yes, dude." GOMEZ stated, "Fuck. Well, head over... be ready heading over there so as soon as 'Chitus' gets there, he can just give us the money, tape that and out." Case agents believe GOMEZ directed ESQUIVEL-SOTELO to get windshield glass for a Mercury Grand Marquis that was being prepped for transport. GOMEZ and ESQUIVEL-SOTELO discussed the Grand Marquis being ready around five o'clock. GOMEZ also told ESQUIVEL-SOTELO to get money and "tape it," a reference to wrapping the money with various concealment techniques to avoid law enforcement detection, consistent with previous seizures.

35. At 2:37 p.m., GOMEZ using Target Telephone #14, received an incoming call from Mexican phone number 52-6531238718. Case agents identified the voice of the user of 52-6531238718 as "Tommy." During the conversation, "Tommy" asked, "...and when did they tell

10

you they will pick up the boat?" GOMEZ replied, "We are moving the tickets right now, taking them to the place. Um, we will put them in and..." "Tommy" stated, "So you are not in a hurry, so that thing dries well." GOMEZ replied, "No, I'm in a hurry, because (U/I) is fucking over and over for me to give him that." GOMEZ said, "And... well, that shit... he said, I have to go for the car over there at the apartments, take it to where we have the Focus." Case agents believe "Tommy" was asking when the transporters will pick up the car ("boat"). GOMEZ told "Tommy" they were moving the money ("tickets") and would put them "in," a reference to putting the money in the car. "Tommy" told GOMEZ to not be in a hurry, so "that thing dries well," meaning the windshield glass dried in the Grand Marquis. Based my familiarity with the investigation, a void in a Grand Marquis underneath the windshield is a common place for the GOMEZ DTO to conceal narcotics and currency.

36. Agents established surveillance in the area of 1916 S. 30th St, Milwaukee, WI, and observed ESQUIVEL-SOTELO, GARNICA-MANRIQUZ, and GOMEZ prepare a white Mercury Grand Marquis for transport.

37. At approximately 6:16 p.m., GOMEZ, using, Target Telephone #14, received an incoming call from 52-6531238718, used by "Tommy." During the conversation, "Tommy" asked, "Just to make sure, the other one came in or did you forget?" GOMEZ responded, "Which one?" "Tommy" replied, "The one that didn't work." GOMEZ responded, "Yes, it's on the way." Case agents believe "Tommy" asked GOMEZ if GOMEZ remembered to return a bad kilogram of cocaine ("the one that didn't work") to "Tommy" in the concealment of the Grand Marquis.

38. At approximately 7:14 p.m., agents observed a white flatbed truck arrive in the alleyway. At approximately 7:19 p.m., the white Grand Marquis was loaded onto the flatbed

11

truck. At approximately 7:29 p.m., the flatbed truck exited the area travelling east. Agents observed GARNICA-MANRIQUEZ and ESQUIVEL-SOTELO enter the white Cadillac Escalade and leave the area in the direction of the flatbed truck. Agents followed the flatbed truck southbound until it exited at 7 Mile Rd at approximately 7:57 p.m. The flatbed truck drove into a secured area and parked in the vicinity of a commercial car carrier.

39.     At approximately 8:33 p.m., agents observed the white Grand Marquis get loaded onto the top of the commercial car carrier. At approximately 8:55 p.m., agents observed the commercial car carrier, with Illinois trailer tag 594563ST leave the area and travel southbound on I-94. Surveillance was then terminated.

40.     At approximately 8:35 p.m., GOMEZ using Target Telephone #14, received an incoming call from 52-6531238718, used by "Tommy." During the conversation, "Tommy" asked, "Did they take the boat already?" GOMEZ responded, "Yeah." "Tommy" asked, "Okay. It has the hundred, right?" GOMEZ replied, "Yes." Case agents believe "Tommy" asked GOMEZ if the transport company took the Grand Marquis ("boat"). "Tommy" also asked GOMEZ if he loaded the car with $100,000 U.S. currency, and GOMEZ replied yes.

41.     On May 13, 2017, case agents provided the description of the commercial car carrier to the Seward County (Nebraska) Sheriff's Office, who had been apprised of the nature of the investigation. During the evening of May 13, 2017, Seward County Deputies located the commercial car carrier travelling west on a side Highway. The car carrier was followed to Interstate 80 in Seward County, Nebraska where a traffic stop was conducted. Deputies spoke to the driver of the car carrier, who stated that the Mercury Grand Marquis was being transported from Wisconsin to California. During a consensual search of the car carrier, Deputies located what appeared to be a concealed compartment underneath the base of the windshield. The

12

windshield was removed and Troopers removed a large amount of bulk U.S. currency, later determined to be $99,920, and approximately one kilogram of cocaine from the compartment.

42. On May 23, 2017, agents analyzed the Facebook account associated with GOMEZ, "Blunose Douglas." Agents are aware that "Blunose Douglas" is GOMEZ's account because of the profile picture being GOMEZ as well as multiple additional photos of GOMEZ posted on the account. An analysis of the "friends" of GOMEZ's Facebook account revealed **"Ymmot Kst" (the Target Account)** as a "friend" of GOMEZ. Agents are aware that "Ymmot" is "Tommy" backwards and "Kst" is a possibly a shortening of the last name "Castro." An analysis of the "friends" account for **"Ymmot Kst" (the Target Account)** revealed the Target Account is "friends" with Facebook account "Esquivel Mario," an account associated with ESQUIVEL-SOTELO, and with Facebook account "Oscar Garnica," an account associated with GARNICA-MANRIQUEZ.

43. Furthermore, an analysis of the "friends" section of **"Ymmot Kst" (the Target Account)** revealed associations with "Bernardo Segundo" and "Victor Carranza." Through public database searches, case agents identified (210) 762-9026 as a cellular telephone number associated with Bernardo SEGUNDO. On May 23, 2017, an administrative subpoena was issued to T-Mobile requesting subscriber information and incoming and outgoing call records for (210) 762-9026 from April 23, 2017 to May 23, 2017. On May 23, 2017, T-Mobile responded that (210) 762-9026 is subscribed to Bernardo Segundo at 4426 N. Hein Rd, San Antonio, TX, and the account was established on March 29, 2016. An analysis of the calls revealed several calls to 52-6531238718, a number associated with "Tommy."

44. Through public database searches, case agents identified (847) 553-1995 as a cellular telephone number associated with Victor CARRANZA. On May 23, 2017, an

13

administrative subpoena was issued to Sprint requesting subscriber information and incoming and outgoing call records for (847) 553-1995 from March 24, 2017 to May 23, 2017. On May 23, 2017, Sprint responded that (847) 553-1995 is subscribed to Victor Caranza at 1422 North Ave, Round Lake, IL, and the account was established on October 15, 2012. An analysis of the calls revealed several calls to 52-6531238718, a number associated with "Tommy."

45.     Based on the above information, case agents believe **"Ymmot Kst" (the Target Account)** is the Facebook account used by "Tommy," the unidentified source of supply for GOMEZ. Case agents also believe that "Tommy" is utilizing Facebook to further his drug trafficking operation.

## REQUEST FOR SEALING AND DELAYED NOTIFICATION

46.     It is further respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing these documents is necessary because this is an ongoing investigation. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other criminals as they deem appropriate, i.e., post them publicly online. Premature disclosure of the contents of this Affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

47.     Similarly, I respectfully request that notification of this warrant be delayed for a period of ninety days, pursuant to Title 18, United States Code, Section 3103a(b). Again,

notification of the warrant would inform targets of the investigation and could cause them to flee the district, or to destroy evidence.

## **CONCLUSION**

48.     Based on the forgoing, your Affiant requests that the Court issue the proposed search warrant. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  Because the warrant will be served on Facebook Inc. who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A

### Property to Be Searched

Information associated with the following Facebook account/username:

Ymmot Kst, with a Facebook identification address of
https://www.facebook.com/profile.php?id=100009676800027 (Target Account)

that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc.,

located at 1601 Willow Road, Menlo Park, CA 94025.

## **ATTACHMENT B**

### **Particular Things to be Seized**

### **I.    Information to be disclosed by Facebook:**

To the extent that the information associated with the accounts/usernames described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), **for the Target Account from March 30, 2017 through the present,** Facebook is required to disclose the following information to the government for each account listed in Attachment A:

a.       Any and all business records maintained by Facebook regarding the requested Facebook account;

b.       All contact and personal identifying information, including User ID name, full name, user identification number, birth date, gender, contact e-mail addresses, passwords, security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

c.       All port data;

. d.       All metadata, including geolocation data, from photographs or other documents or information associated with the account, regardless of whether such metadata is posted to or available on the subscriber's Facebook page;

e.       All applications, websites, or other service, sites, or account for which the logins for the requested accounts are used or to which the requested accounts are linked or synced;

f.	Any unique advertising ID associated with any device used to access or log into the requested Facebook accounts;

g.	All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

h.	All Photoprints, including all photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

i.	All audio and video files uploaded by that user or channel, or that have that user tagged or identified in them;

j.	All Neoprints, including profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

k.	All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

l.	All "check ins" and other location information;

m.	All IP logs, including all records of the IP addresses that logged into the account;

n.	All records of the account's usage of the "Like" feature, including all Facebook and all non- Facebook webpages and content that the user has "liked";

o.	All information about the Facebook pages or channels that the account is or was a "fan" of;

p.	All data and information that has been deleted by the user;

q.    A list of all users that the account has "unfollowed" or blocked;

r.    All "lists" created by the account;

s.    All information on the "Who to Follow" list for the account;

t.    All past and present lists of friends created by the account;

u.    All records of Facebook searches performed by the account;

v.    All information about the user's access and use of Facebook Marketplace;

w.    The types of service utilized by the user;

x.    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

y.    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which users have been blocked by the account; and

z.    All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.    Information to be seized by the United States

All information described above in Section I that constitutes fruits, evidence and instrumentalities of federal law, specifically: conspiracy to import controlled substances into the United States, in violation of Title 21, United States Code, Section 963, from March 30, 2017, to the present, for the account/username identified in Attachment A, including the following:

a.    Messages, correspondence, documents, photographs, videos, recordings, and records pertaining to the importation, possession, purchase, use, trafficking and distribution of narcotics; and

b.    Messages, correspondence, documents, photographs, videos, recordings, and records pertaining to the identity and location of the account user(s).